**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard Lee CANTERBURY,**
**Defendant–Appellant.**

No. 92–1028.

United States Court of Appeals,
Tenth Circuit.

Jan. 14, 1993.

Rehearing Denied March 31, 1993.

Charles S. Szekely, Asst. Federal Public Defender (Mark J. Rosenblum, Asst. Federal Public Defender, and Michael G. Katz, Federal Public Defender, on the brief), Denver, CO, for defendant-appellant.

John M. Hutchins, Asst. U.S. Atty. (Michael J. Norton, U.S. Atty., and Craig F. Wallace, Asst. U.S. Atty., with him on the brief), Denver, CO, for plaintiff-appellee.

Before BALDOCK and HOLLOWAY, Circuit Judges, and O'CONNOR, Senior District Judge.*

EARL E. O'CONNOR, Senior District Judge.

Defendant was convicted by a jury for possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). Defendant appeals his conviction on the ground that he was denied due process when the prosecutor made an impermissible comment on his post-arrest silence. Specifically, defendant contends that his rights were violated when the prosecutor asked him why he did not "make a clean breast of it" and tell the arresting officers that he had been set up. In addition, defendant contends the trial court erred in denying his motion for a mistrial after a government witness identified himself as an agent with the Drug Task Force, thereby injecting drugs into the case when drugs were not relevant to the offense charged.

We hold that the prosecutor's comment on the defendant's post-arrest silence was a violation of Canterbury's due process rights, and the error was not harmless beyond a reasonable doubt. Therefore, the conviction must be reversed and the case remanded for a new trial.

### Background

Defendant Richard Lee Canterbury was a friend of an individual named Steven Enrici. Bad blood developed between the two men when a business deal turned sour and Enrici refused to pay Canterbury a previously agreed upon sum of money. Later, Enrici went to the police, claiming that Canterbury had threatened him and his family over the debt. In the course of his conversation with the police, Enrici stated that Canterbury had asked him about acquiring a silencer. Hearing this, the police contacted Special Agent Thomas Lindsey of the Bureau of Alcohol, Tobacco, and Firearms.

Enrici arranged a meeting between Canterbury and Special Agent Lindsey (posing undercover) to discuss whether Canterbury was interested in acquiring a silencer from Lindsey. Enrici had led Canterbury to believe that Agent Lindsey was a friend of his who made silencers at a local machine shop. The understanding between Enrici and Canterbury was that Enrici would provide the silencer to Canterbury in partial payment of his debt.

Lindsey, Canterbury, and Enrici met in a parking lot behind an abandoned K–Mart. Lindsey asked Canterbury if he was "looking for something that muffles," and Canterbury responded that he was. Lindsey displayed a silencer to Canterbury, and asked Canterbury if that was what he wanted. Canterbury responded affirmatively, and told Lindsey that he wanted silencers for his 9mm handgun and also for his 20 gauge shotgun.

The three men met a second time to consummate the transaction. After a brief conversation, Lindsey handed a silencer to Canterbury and asked him if this was what he wanted. Canterbury replied that it was. Agent Lindsey then gave the arrest signal and Canterbury was arrested by the surveillance team and taken into custody.

Canterbury was advised of his *Miranda* rights at the time of arrest and again at the police station. At the station, he signed a written advisement form, indicating he had been advised of his rights. Canterbury responded to several questions posed by Detective Schuelke of the local police. According to Detective Schuelke, Canterbury made three oral statements. First, Canterbury was asked whether he had any more silencers; the answer to this

---

* The Honorable Earl E. O'Connor, Senior United States District Judge, United States District Court for the District of Kansas, sitting by designation.

question was no. Next, Canterbury admitted buying the silencer in question. Finally, Detective Schuelke asked Canterbury why he needed a silencer, to which Canterbury responded, "for protection." On the witness stand, Canterbury denied making this last statement.

At trial, Canterbury raised an entrapment defense. He testified that Enrici owed him money and that Enrici told him the only way he could repay the debt would be to provide him with a silencer. According to Canterbury, he was not interested at first, but eventually decided to accept the silencer from Enrici as a last resort to collect on the debt.

The jury rejected Canterbury's defense and convicted him as charged.

*Discussion*

■ Canterbury's principal point on appeal is that his due process rights were violated when the trial court permitted the prosecutor to ask a series of questions about his failure to tell the arresting officers that he had been set up. The trial court overruled Canterbury's timely objection to this line of questioning. Generally, we review rulings pertaining to the scope of cross examination for abuse of discretion. *See United States v. Atwell,* 766 F.2d 416, 419 (10th Cir.1985), *cert. denied,* 474 U.S. 921, 106 S.Ct. 251, 88 L.Ed.2d 259; *United States v. Falcon,* 766 F.2d 1469, 1477 (10th Cir.1985). However, where the error results in a violation of the defendant's constitutional rights, it is the government's burden to prove that the error was harmless beyond a reasonable doubt. *United States v. Burson,* 952 F.2d 1196 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992); *United States v. Massey,* 687 F.2d 1348, 1353 (10th Cir.1982).

Canterbury's assertion of error concerns the following exchange on cross-examination:

"Q: [by the Prosecutor] Did you tell Detective Schuelke that you did buy that silencer for protection?

A: [Canterbury] No.

Q: Did you give him any reason for buying that silencer?

A: No.

Q: Yet, before the contact by Mr. Enrici, you had never intended to buy a silencer illegally, isn't that correct?

A: No. I wouldn't have been, no.

Q: Why didn't you make a clean breast of it to Detective Schuelke right then?

A: Because Detective Schuelke came at me with saying you have another silencer. Where is it at? I want to search your house. I want to search your car and this sort of thing. And, I didn't know what had happened.

Q: But, didn't you feel that you'd been set up?

A: Well, I didn't know because when they arrested me, they knocked Steve down also.

Q: They knocked him down?

A: Or took him to the ground.

Q: Okay. But you knew you were in the Denver Police Department, correct?

A: Yes.

Q: Where people work who are tasked with enforcing the law?

A: Yes.

Q: And protecting citizens?

A: Yes.

Q: Why didn't you just say I'm so glad this is over. I have been set up. You can't believe what I've been through and I want to straighten this out?"

At this point, defense counsel objected on the grounds that the questioning was an improper comment on the defendant's post-arrest silence. The objection was overruled, and cross-examination of the defendant concluded with this exchange:

"Q: [by the Prosecutor] Mr. Canterbury, isn't it—I'll just rephrase it. Isn't it a fair statement that at no time after your arrest on August 29, either at the Burger King or at the police station, did you ever state to the police officer I've been set up?

A: [Canterbury] No, I did not. I didn't realize it at the time."

■ The use for impeachment purposes of a defendant's post-arrest silence violates the Fourteenth Amendment's mandate of due process if the silence follows the administration of *Miranda* warnings. *United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir.1982) (citing *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982); *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976)). This rule is based upon a recognition that it is fundamentally unfair for the government to inform a defendant of his right to remain silent and then ask at trial that a negative inference be drawn from that silence. *Id.* (citing *Anderson v. Charles*, 447 U.S. 404, 407–08, 100 S.Ct. 2180, 2181–82, 65 L.Ed.2d 222 (1980)); *see Doyle*, 426 U.S. at 618–19, 96 S.Ct. at 2245 (quoting *United States v. Hale*, 422 U.S. 171, 182–83, 95 S.Ct. 2133, 2139–40, 45 L.Ed.2d 99 (1975)) (White, J., concurring). Silence in the wake of *Miranda* warnings is "insolubly ambiguous" because it may indicate no more than an arrestee's exercise of the *Miranda* rights. *Doyle*, 426 U.S. at 610, 96 S.Ct. at 2241.

■ While due process permits no comment on the defendant's post-arrest, post-*Miranda* silence, a prosecutor may impeach a defendant's trial testimony with prior inconsistent statements. *Charles*, 447 U.S. at 408, 100 S.Ct. at 2182. "Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* In *Anderson v. Charles*, the defendant told police he stole a car from a certain neighborhood, but testified at trial that he stole the car from a parking lot near the jail where he was held awaiting trial. On cross-examination, the prosecutor pointed out that the defendant could see the parking lot from his cell window, and suggested that the defendant's new story was a fabrication. The prosecutor asked why the defendant did not tell the same story at the time of his arrest. The Supreme Court found this line of questioning proper because "[t]he questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* at 409, 100 S.Ct. at 2182.

Application of the foregoing principles to the instant case is complicated by the fact that Canterbury did not remain totally silent, but instead made several statements to the police after he received *Miranda* warnings. This court has recognized that when a defendant answers some questions and refuses to answer others, or in other words is "partially silent," this partial silence does not preclude him from claiming a violation of his due process rights under *Doyle*. *United States v. Harrold*, 796 F.2d 1275, 1279 n. 3 (10th Cir.1986), *cert. denied*, 479 U.S. 1037, 107 S.Ct. 892, 93 L.Ed.2d 844 (1987). Therefore, this case turns on whether the cross-examination was designed to impeach the defendant's trial testimony by calling attention to prior inconsistent statements or, instead, was designed to suggest an inference of guilt from the defendant's post-arrest silence.

■ The cross-examination in this case was improper. The questions were not designed to point out inconsistencies between Canterbury's trial testimony and his statements at the time of arrest. In fact, Canterbury's post-arrest statements are not inconsistent with his entrapment defense. The inference suggested by the line of questioning is that Canterbury was guilty because an innocent person would have presented the set-up theory to the arresting officers. The focus of the examination was therefore not on inconsistent stories as in *Charles*, but on Canterbury's failure to present his exculpatory story at the time of arrest. Because the examination was designed to discredit the defendant's trial testimony by drawing attention to his post-arrest silence, it was a violation of his due process rights under *Doyle*.

■ Because the error is of constitutional dimension, a new trial is required unless from the record as a whole we are convinced that the error was harmless beyond a reasonable doubt. *Massey*, 687 F.2d at 1353. This court has delineated factors to consider in making this determination:

"1. The use to which the prosecution puts the postarrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions."

*Massey*, 687 F.2d at 1353. The essence of this inquiry is usually the purpose for which the defendant's silence was introduced, and the quantum of other evidence supporting the guilty verdict. *Harrold*, 796 F.2d at 1280. As discussed above, the purpose of the offending cross-examination in this case was to discredit the entrapment defense by drawing attention to Canterbury's silence at the time of arrest. Because the success of the defense hinged almost entirely on the defendant's credibility, we are not satisfied that this violation of Canterbury's due process rights was harmless beyond a reasonable doubt. Unlike *Harrold*, this is not a case where the defendant's theory is "transparently frivolous" and the evidence of guilt overwhelming. *See Id.* On the contrary, the evidence in the case was not inconsistent with Canterbury's entrapment defense, and the jury could have acquitted him had it believed his testimony. By using Canterbury's postarrest silence to impeach his testimony, the government attacked the heart of his defense. *Cf. Massey*, 687 F.2d at 1353–54. The error cannot be considered harmless, and a new trial is required.

Because the case must be reversed, our consideration of appellant's other point on appeal is unnecessary.

REVERSED AND REMANDED.