**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 7 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MICHAEL V. PEMBERTON,

      Defendant-Appellant.

No. 99-2233
(D.C. No. CR-98-252-MV)
(Dist. N.M.)

**ORDER AND JUDGMENT**[*]

Before **BALDOCK**, **HOLLOWAY**, and **EBEL**, Circuit Judges.

Defendant-Appellant Michael V. Pemberton was convicted by a jury of Voluntary Manslaughter, in violation of 18 U.S.C. § 1152, and Using and Carrying a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1) and sentenced to 117 months' imprisonment. He now appeals the convictions. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## BACKGROUND

In the afternoon of March 10, 1998, Ms. Juanita Barton and her brother, Mr. Julian Joachine Redhouse, went to the home Pemberton shared with his wife, Ms. Antoinette Pequin, on the Navajo Reservation near Crystal, New Mexico. Pequin was a friend of Barton's. Barton and Redhouse brought with them four "tall-boys" (forty-ounce containers of beer), which Barton, Redhouse, and Pemberton then began to drink. No one else was home at the time. Soon thereafter, the three drove to Gallup, New Mexico, purchased more beer (a thirty-pack of twelve-ounce cans), and returned to Pemberton's home. Upon their return, Pemberton's son Justin (also known as "J.D.") had come home from school.

The adults continued to drink steadily for several hours. During this time, Pemberton and Redhouse consumed between ten and twelve beers each, and Barton consumed approximately eight beers. Pemberton and Redhouse played checkers for a while in the kitchen, and, Pemberton and his son testified, Redhouse became angry and verbally abusive toward Pemberton. Pemberton testified that Redhouse threatened to "beat your white ass." Pemberton then put the checkers game away. Soon thereafter, Justin went to bed.

According to Pemberton, Redhouse grew increasingly belligerent. Pemberton testified that Redhouse "was spending less time sitting down and a

whole lot more time either cussing me or pushing me around and hitting on me." Pemberton testified that Redhouse then grabbed a butcher knife that was near the kitchen sink and began walking toward Pemberton while tossing the knife from hand to hand. At that time, Pemberton testified, Redhouse said "I'll just kill you and that half breed kid." Pemberton then went to his bedroom and retrieved his hunting rifle, which was already loaded, and then returned to the kitchen.

Pemberton testified that he was scared of Redhouse, and that Redhouse "looked mean." At this point, Redhouse was seated in a chair in the kitchen. Pemberton fired a warning shot to scare Redhouse. Then, Pemberton testified, Redhouse said to him "you son of a bitch" and started to get up out of the chair. Pemberton testified that he thought Redhouse was coming after him with the butcher knife, although Pemberton conceded that he did not see the knife in Redhouse's hands at that moment. Pemberton then fired a second shot, which struck Redhouse in the neck and killed him.

At approximately 7:00 p.m., Barton had written a note to Pequin, and Barton then went to use the outhouse. As she exited the outhouse,[1] Barton heard the two gunshots and quickly came back to the house.

---

[1] Pemberton testified that Barton had returned from the outhouse before he fired the gun and was sitting in the kitchen.

When Barton returned, she saw Pemberton standing nearby with the gun in his hands. The two struggled briefly over the gun, but Pemberton pulled the gun away from her and left the house. Barton then left the house to go for help. Pemberton then walked to an unoccupied house nearby. He surrendered to police the next day.

The following day, FBI Agent Steve Vedral interviewed Pemberton about the incident. Pemberton signed a waiver of rights form and then orally explained to Agent Vedral what had happened. Agent Vedral took notes as Pemberton spoke, but he had difficulty following the events as Pemberton was describing them. As a result, Agent Vedral asked Pemberton to write out a statement, which Pemberton agreed to do. After completing the brief written statement, Pemberton indicated that he did not want to continue the interview. Agent Vedral then ceased his questioning.

At no point in his oral or written statements did Pemberton specifically mention that Redhouse had possessed a butcher knife. Although kitchen knives were found at the scene, none appeared to have been in Redhouse's hands when he was shot.

**DISCUSSION**

Appellant alleges four sources of error: (1) the prosecutor's comments to the jury during closing argument regarding the availability of the self-defense

justification to a voluntarily intoxicated defendant; (2) the prosecutor's questioning and argument regarding the defendant's apparent failure to mention in his post-arrest statements the victim's possession of a knife; (3) the prosecutor's comments that the defendant's presence at trial allowed him to tailor his testimony; and (4) the prosecutor's comments regarding defense counsel's failure to mention the victim's alleged possession of a knife in his opening statement. Defense counsel, however, objected to none of these errors at trial. As a result, we may only review these claims for plain error. See United States v. Roberts, 185 F.3d 1125, 1143 (10th Cir. 1999); United States v. Mills, 194 F.3d 1108, 1113 (10th Cir. 1999); United States v. Oberle, 136 F.3d 1414, 1421 (10th Cir. 1998).

Under the plain error standard of review, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Johnson v. United States, 520 U.S. 461, 467 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993) (alterations, citation, and further quotation omitted)). For an error to impact substantial rights, "[i]t must have affected the outcome of the district court proceedings," and "[i]t is the defendant rather than the Government who bears the burden of persuasion with

respect to prejudice." Olano, 507 U.S. at 734. However, "[w]e apply this standard of review with somewhat less rigidity given [a] claim [that] alleges constitutional error." United States v. Lindsay, 184 F.3d 1138, 1140 (10th Cir. 1999).

### I. Prosecutor's Comments Regarding the Availability of the Self-Defense Justification to a Voluntarily Intoxicated Defendant

Appellant claims that one of the prosecutors, Assistant United States Attorney Kevin Washburn, misstated the law governing the self-defense justification in his closing statement. Appellant argues that the attorney's comments led the jury to believe that a voluntarily intoxicated defendant cannot claim that he responded reasonably to the situation confronting him. The relevant statements were as follows:

> Let me talk about the self-defense part first. One of the rules that you will see in the instructions is that the use of deadly force is justified only if a person reasonably believes that force is necessary to prevent death or bodily injury. If that belief wasn't reasonable, then he's not entitled to self-defense.
> Do you remember voir dire? Do you remember when Mr. Finzel [defense counsel] and Ms. Bliss [counsel for the government] were asking you all questions with all the other potential jurors? Do you remember the man who stood up and he said, self-defense requires judgment, and he expressed concern about the alcohol use that had been discussed. That man may not have known it, but he expressed a pretty good practical explanation of self-defense. It requires a reasonable belief that you are in trouble. **If you are drunk and you are not thinking reasonably, then that's not proper self-defense.**
> Now, having said all that, do you really think it was self-defense?

(Tr. 1065-66) (emphasis added).

The juror to whom Mr. Washburn was referring had been excused for cause during voir dire because the venire person believed that he could not consider the self-defense justification for a person who had been drinking too much. That is, the venire person believed that a voluntarily intoxicated individual could not be thinking reasonably and could therefore not act in self defense.

The prosecution's reference to this excused venire person's belief was clearly an attempt to suggest to the jury that Appellant's intoxication at the time of the shooting should defeat his claims of self-defense. This statement, however, misstates the law. "[One] may justifiably use *deadly* force against the other in self-defense . . . only if he reasonably believes that the other is about to inflict unlawful death or serious bodily harm upon him (and also that it is necessary to use deadly force to prevent it)." 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.7(b) (West 1986) (footnotes omitted); see also United States v. Scalf, 725 F.2d 1272, 1273-74 (10th Cir. 1984) (approving the following jury instruction: "'Even though a person may be justified in using force in self-defense, he is not entitled to use any greater force than he had reasonable ground to believe and actually did believe to be necessary under the circumstances to save his life or avert serious bodily harm.'"). The reasonableness of a voluntarily intoxicated defendant's response is measured

through the eyes of a reasonable sober individual, see 1 LaFave & Scott at § 4.10(d); United States v. Weise, 89 F.3d 502, 505 (8th Cir. 1996), but the mere fact of a defendant's intoxication does not preclude a self-defense justification. Thus, we conclude that the prosecutor's comments erroneously stated the law.

"Certainly, it is improper for the prosecution to misstate the law in its closing argument." United States v. Hollis, 971 F.2d 1441, 1455 (10th Cir. 1992). Nevertheless, the jury in the present case was instructed that "[u]se of force is justified when a person reasonably believes that it is necessary for the defense of oneself or another against the immediate use of unlawful force. A person acting in self defense, however, must use no more force that [sic] appears reasonably necessary under all of the circumstances." "Generally, we presume that the jury followed the court's legal instructions, not the prosecutor's." Hollis, 971 F.2d at 1455.

Moreover, an error does not affect the defendant's "substantial rights" unless it affected the outcome of the proceedings. See Olano at 734. On this record, we cannot conclude that Appellant would have succeeded on his self-defense claim absent the prosecutor's misstatement. Because Appellant employed deadly force by firing the rifle, he was required to show that it was reasonable to believe that Mr. Redhouse posed an imminent threat to him of death or serious bodily harm. We do not believe the record warrants this conclusion. In any

event, we conclude that the prosecutor's misstatement of the law did not affect the Appellant's "substantial rights," and thus there was no plain error.

### II. The Prosecutor's Questioning and Argument Regarding Appellant's Post-Arrest Statements

Appellant also argues that the prosecution committed plain error by referring to Appellant's failure specifically to mention the presence of a butcher knife in his post-arrest statements to Agent Vedral. "While due process permits no comment on the defendant's post-arrest, post-Miranda silence, a prosecutor may impeach a defendant's trial testimony with prior inconsistent statements." United States v. Canterbury, 985 F.2d 483, 486 (10th Cir. 1993).

The case at bar presents an instance of "partial silence," in which the defendant made some post-arrest, post-Miranda statements but ultimately invoked his right to remain silent before completing the discussion. Agent Vedral took notes during his conversation with Appellant, but these notes hardly support the government's contention that "Pemberton made numerous, detailed, inculpatory statements." Moreover, Agent Vedral testified that his notes were incomplete because "I couldn't understand what he was trying to say to me as far as the different events, how they took place."

The statement written by Appellant at the time is similarly brief and somewhat confusing. The full text of the statement is as follows:

I asked them to leave they won't then this guy starts to push me around so I had to defend myself.

I tried to get this guy to leave but he won't. I'm scared.

He was acting weird.

I was happy drunk and he was mean drunk.

I fired a warning shot, and this guy comes at me. I fired the second time to defend myself.

He was about attacking [sic] me.

I didn't plan this, the beer caused all this to happen.

Agent Vedral testified that Pemberton then stopped the interview. As a result, Agent Vedral further testified, his interview was incomplete because he was not able to ask Pemberton a number of questions he would have asked during a normal investigation. Agent Vedral did not ask Pemberton whether the victim had a weapon at the time of the shooting. Thus, it is clear from the record that Appellant was "'partially silent' by answering some questions and refusing to answer others." United States v. May, 52 F.3d 885, 890 (10th Cir. 1995).

Whether a prosecutor has committed a due process violation under Doyle v. Ohio, 426 U.S. 610, 610 (1976),[2] "turns on whether the [questions and comments

_____

[2] "[I]t would be fundamentally unfair to allow an arrestee's silence to be used to impeach an explanation subsequently given at trial after he had been impliedly assured, by the Miranda warnings, that silence would carry no penalty." Doyle v. Ohio, 426 U.S. 610, 610 (1976).

were] designed to impeach the defendant's trial testimony by calling attention to prior inconsistent statements or, instead, [were] designed to suggest an inference of guilt from the defendant's post-arrest silence." Canterbury, 985 F.2d at 486. "'The court must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact on the jury.'" United States v. Mora, 845 F.2d 233, 235 (10th Cir. 1988) (quoting United States v. Morales-Quinones, 812 F.2d 604, 613 (10th Cir. 1987). Accordingly, we must examine the prosecutor's comments and questions in the present case.

Appellant points to multiple references by the prosecution to the fact that Appellant did not mention the knife in his statement to Agent Vedral. Our review of the trial transcript reveals that the prosecution made these references on direct examination of Agent Vedral, on redirect of Agent Vedral, on cross-examination of the defendant, on direct examination of Agent Vedral in the prosecution's rebuttal, and in closing arguments. The thrust of these questions and comments was to drive home the point that the defendant had never before mentioned a fact so significant to his theory of self-defense.

The plain error standard of review requires that the mistake be an obvious one (i.e., "plain"). In the present case, however, it is not obvious that the defendant's failure to mention previously such an important fact is actually

consistent with his subsequent testimony. Although incomplete, Appellant's post-arrest statements do contain some degree of detail suggesting that he would have mentioned the knife had it actually been present. For example, Agent Vedral's notes of Appellant's oral statement refer to specific comments made by the victim and the fact that the victim kept "verbally attacking me." Moreover, Appellant's written statement described both his and the victim's states of mind ("I was happy drunk and he was mean drunk."), as well as how the victim was going to attack him. Though not an exhaustive account of the these events, Appellant's statements contain a sufficient level of detail suggesting that he would have mentioned a knife in the hands of the victim. It was, consequently, at least a matter of some ambiguity whether Appellant's trial testimony was inconsistent with these prior statements and therefore impeachable. Thus, any error committed by the prosecution in referring to Appellant's failure to mention the knife in his post-arrest statements was not plain.

### III. Prosecutor's Comments Regarding Defendant's Presence at Trial Potentially Influencing His Testimony

Appellant complains that the prosecutor impermissibly commented on the fact that Appellant's presence at trial allowed him the opportunity to tailor his own testimony accordingly. In closing argument, the prosecutor said to the jury when discussing Appellant's testimony regarding the butcher knife: "Remember, Ladies and Gentlemen, this man has been sitting in here the entire time, hearing

every single witness in this case." Appellant argues that this comment violated his rights to be present at trial and to choose whether to testify in his own defense.

After the instant case was presented at oral argument, the Supreme Court issued a decision disposing of this issue. In Portuondo v. Agard, 120 S. Ct. 1119 (2000), the Court concluded that substantially similar comments made by the prosecutor in closing arguments did not violate the Constitution. "Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate–and indeed, given the inability to sequester the defendant, sometimes essential–to the central function of the trial, which is to discover the truth." Id. at 1127. In light of this decision, we must reject Appellant's argument that the prosecutor's comments were unconstitutional.

### IV. Prosecutor's Comments Regarding Defense Counsel's Failure to Mention a Knife in His Opening Statement

Appellant alleges that the prosecutor made improper remarks during his closing argument regarding defense counsel's failure to mention during opening argument that the victim was wielding a knife when Appellant shot him. After emphasizing that Appellant had not mentioned the knife in his post-arrest statements, the prosecutor said to the jury: "Now, he probably didn't even tell his own lawyer about that knife. You didn't hear a word about that knife in opening

statement." Defense counsel then objected, which the court sustained and directed the jury "to disregard that last comment." The prosecutor then continued: "You heard nothing about that knife until Mr. Pemberton took the stand. That knife probably didn't exist until that point." Defense counsel did not object to these ensuing comments, nor did he request a mistrial on the basis of the sustained objection.

Appellant now contends that the court's admonition to the jury was insufficient to correct the improper statements about communications between the Appellant and his trial counsel. Appellant argues that the prosecutor's subsequent comments "essentially repeated" the prior improper statements. We disagree.

The prosecutor's statements following the sustained objection and the court's admonition to the jury highlighted the prosecution's argument regarding the defendant's failure to mention the knife in his post-arrest statements. The comments made no reference to communications between the defendant and his counsel. We have previously explained that the prosecution's repeated references to the fact that the defendant did not mention the knife in his post-arrest statements do not constitute plain error. Viewed in context, the prosecutor's comments following the objection are of the same variety. Accordingly, we find no plain error in the prosecutor's comments.

## CONCLUSION

In sum, we find no plain error in the prosecutor's comments, questions, or arguments.  The judgment of the district court is therefore AFFIRMED.


ENTERED FOR THE COURT


David M. Ebel
Circuit Judge