**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 16 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RODNEY B. WHITE,

      Defendant-Appellant.

No. 02-1304
(D. Colo.)
(D.C. No. 00-CR-358-WM)

---

**ORDER AND JUDGMENT** [*]

---

Before **O'BRIEN** and **HOLLOWAY**, Circuit Judges, and **LUNGSTRUM**, District Judge [**].

---

Defendant-Appellant Rodney B. White, then a prisoner in the United States Penitentiary at Florence, Colorado, was charged in a one-count superceding indictment with attempting to obtain contraband in prison in violation of 18 U.S.C. §§ 1791(a)(2) and (d)(1)(C). At trial, defendant White represented himself, assisted by advisory counsel. The jury convicted him, and he was later

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable John W. Lungstrum, United States District Judge for the District of Kansas, sitting by designation.

sentenced to 41 months in prison, to be served consecutively with the sentence he was already serving from the Northern District of Texas. He now appeals the conviction, contending that the trial court erred in permitting the government to use a witness' hearsay statements as substantive evidence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## BACKGROUND

During routine monitoring of telephone calls by inmates in the United States Penitentiary in Florence, Colorado, prison officials learned that Gloria Scott, the sister of defendant Rodney B. White, an inmate in the penitentiary, was expected to visit her brother and attempt to introduce contraband into the prison on March 27, 1998. Prison officials notified the FBI of this possibility, and FBI Special Agent George Veltman conducted an investigation. Based on the monitored telephone calls, he obtained a warrant to search Ms. Scott when she arrived at the prison.

Ms. Scott arrived at the prison, as expected, on March 27, 1998. After checking-in, she was led to an isolated room where a female Bureau of Prisons officer searched her pursuant to the warrant. During the search, Ms. Scott produced two cellophane bags of M&M peanut candies that were later found to contain small balloons of tar heroin. After the search, Agent Veltman advised

Ms. Scott of her rights, she made a statement to Agent Veltman concerning her attempt to introduce contraband into the prison, and she was arrested.

Nearly two years after the incident, on March 8, 2000, Agent Martin Daniell conducted an interview of defendant White concerning the incident at the penitentiary. During the interview, defendant White made the following inculpatory admissions: he owed a $300 gambling debt to another inmate named Sorapuru, inmate Sorapuru told him that the debt would be forgiven if "certain items" were to come into the prison, he contacted his sister (Gloria Scott) by telephone and asked her to bring drugs into the prison, she agreed to do so, he provided his sister with Lisa Sorapuru's (inmate Sorapuru's sister) phone number because Ms. Sorapuru was to supply the narcotics to be brought into the prison, and Ms. Sorapuru gave Ms. Scott the narcotics to be smuggled into the prison.

Ms. Scott entered into a plea agreement with the government on July 19, 2001, to plead guilty to the introduction of contraband into the penitentiary on March 27, 1998. Several days later she pled guilty to the charge in Lubbock, Texas. The plea agreement, which bore the signatures of Ms. Scott and her attorney in Texas, contained the necessary factual basis to support Ms. Scott's plea of guilty. It specified that she was at the penitentiary in Florence, Colorado, to visit her brother on March 27, 1998; she had contraband in her possession when she entered the prison; and she was bringing the contraband (i.e., heroin)

into the prison at the behest of her brother, Rodney White, to whom she was to deliver the contraband during the visit. The court in Texas accepted Ms. Scott's plea agreement and sentenced her to a term of imprisonment.

Defendant White's jury trial commenced on April 29, 2002, with defendant White representing himself, assisted by advisory counsel.[1] The next day, the trial concluded and the jury found defendant White guilty as charged in the superceding indictment. After the trial court sentenced defendant White, he filed this appeal.

## DISCUSSION

Defendant White contends that the court erred by allowing the government to use the hearsay statement of his sister, Gloria White, to FBI Agent Veltman at the time of her arrest as substantive evidence of defendant White's guilty knowledge of the offense. More specifically, defendant White contends that the trial court erred by not instructing the jury that Ms. Scott's statement was being used only for impeachment purposes and by permitting the government to use Ms. Scott's statement as substantive evidence during closing argument.

---

[1] The district court appointed Richard N. Stuckey to act as advisory or stand-by counsel for defendant White during the trial; under the Criminal Justice Act, 18 U.S.C. § 3006A, this court thereafter appointed Mr. Stuckey to represent defendant White on appeal.

The central issue at trial was whether defendant White instructed his sister to bring drugs into the prison or whether she undertook the endeavor without her brother's knowledge. The government called Ms. Scott to the stand, in part, to establish her brother's knowledge of the drug transaction. On direct examination, Ms. Scott testified that she went to the prison to visit her brother, but repeatedly denied or stated that she honestly did not remember whether her brother made telephone calls to her instigating the transaction. ROA, Vol. 3 at 31. When asked whether she told Agent Veltman at the time of her arrest that her brother told her on the telephone that he needed her help to bring drugs into the prison, she testified that she could not recall making such statements because the incident occurred five years earlier. *Id.* at 39. When the government then asked her what she did remember, she stated that she met a woman by the name of Lisa in Florence, Colorado, Lisa told her that her brother owed a gambling debt that she could help him pay off by bringing drugs into the prison, Lisa gave her some balloons which she put into a candy package, and Lisa asked her to take the heroin-filled balloons to the prison where Lisa's brother (another inmate whose name was unknown to Ms. Scott) would be waiting in the visiting room to receive them. *Id.* at 38-43, 56-58. Ms. Scott also testified that her brother, defendant White, never mentioned Lisa Sorapuru to her and that he had no knowledge of what she was doing. *Id.* at 53, 56-58.

The government, knowing that Ms. Scott's testimony conflicted with her prior statement to Agent Veltman and with her plea agreement, then called Agent Veltman to the stand. He testified that he interviewed Ms. Scott at the time of her arrest. When the government asked Agent Veltman what Ms. Scott said during that interview, defendant White objected to the question on hearsay grounds. *Id.* at 70. The government responded that the question was for impeachment purposes and reworded the question as: "Did Gloria Scott tell you that she was coming into the prison to give the drugs to somebody other than her brother?" *Id.* Defendant White did not object to the question as rephrased, and the witness answered: "No, she did not. I asked her specifically who she was coming to visit, and she signed in to visit her brother." *Id.* The government then asked a second question: "Ms. Scott testified that someone else had made arrangements for her to bring the drugs in during her testimony in chief. Did she tell you something different on March 27, 1998?" *Id.* at 71. Defendant White objected to this question on hearsay grounds as well. *Id.* The court initially sustained the objection at the end of the first day of trial but the next morning the government explained that it intended to use Agent Veltman's testimony for impeachment purposes only pursuant to Federal Rule of Evidence 613(b). *Id.* at 71, Vol. 4 at 88. The court then reviewed Ms. Scott's testimony at trial, determined it was inconsistent with Agent Veltman's proposed testimony of the events, reversed its

- 6 -

ruling, and permitted Agent Veltman to testify regarding Ms. Scott's prior statements but only to impeach Ms. Scott's testimony at trial pursuant to Rule 613(b). ROA, Vol. 4 at 146-47. The following discourse then occurred:

> Q. (by prosecutor): Mr. Veltman, yesterday you testified with respect to a statement given to you by Gloria Scott on March 27, 1998.
> A. I remember, yes.
> Q. And Ms. Scott testified yesterday that she couldn't remember or had no memory of her telling you that she was bringing drugs into the prison for Rodney White. What is your memory of the statement that she gave you on March 27, 1998, with respect to that statement?
> A. She told me, if I remember correctly, that she was going to come the previous week to deliver the drugs to her brother, Rodney White. It got postponed until the week that I met her when she was coming in to deliver them to him.
> Q. And who was she to deliver the drugs to?
> A. To Rodney White, her brother.
> Q. She also had no memory with respect to communicating with Gloria Scott [sic]. Do you have a memory of that?
> A. She advised me that she had communicated with her brother to – that he wanted her to bring them in. She also had been in touch with Lisa – she didn't know her last name – to make arrangements to get the narcotics to her and also gave her instructions on how to put them in the M&M packs before she brought them into the prison.

*Id.* at 147-48.

Under the circumstances, we conclude that the initial introduction of Ms. Scott's prior inconsistent hearsay statement for impeachment purposes was proper. Under Rule 613(b), extrinsic evidence of a prior inconsistent statement may be introduced to impeach a prior witness' testimony, but may not be used as

- 7 -

substantive evidence. *United States v. Mitchell*, 113 F.3d 1528, 1532 (10th Cir.), *cert. denied*, 522 U.S. 1063 (1997); *United States v. Denetclaw*, 96 F.3d 454, 457 (10th Cir. 1996). Such evidence, however, is not admissible "unless the witness is afforded an opportunity to explain or deny the same." Fed. R. Evid. 613(b); *Anderson v. Charles,* 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980); *United States v. Canterbury,* 985 F.2d 483, 486 (10th Cir. 1993).

In this action, when Ms. Scott was asked on direct examination whether she recalled stating to Agent Veltman that her brother told her on the telephone that he needed her help to bring drugs into the prison, she testified that she could not remember if she made such statements because the incident occurred five years earlier. She later testified that her brother did not know that she was attempting to bring drugs into the prison. This testimony is directly inconsistent with the statement that Ms. Scott allegedly made to Agent Veltman when she was arrested. She was given an opportunity to explain or deny making the prior statement in accordance with Rule 613(b). She testified that she could not remember making the statement but confirmed that she remembered the events leading up to her arrest. Thus, the trial court was correct in permitting the prosecution to use Ms. Scott's prior inconsistent statement to Agent Veltman in an attempt to impeach Ms. Scott. *See Mitchell*, 113 F.3d at 1532 (holding that prior inconsistent statement should have been admitted under similar circumstances).

Defendant White further argues on appeal that the trial court erred in not providing the jury with a limiting instruction to the effect that the prior inconsistent statement was to be considered only for impeachment purposes and by permitting the prosecution to use Ms. Scott's hearsay statements during its closing argument as substantive evidence of defendant White's knowledge of the offense. [2] Defendant White, however, did not request a limiting instruction at the

_____

[2] During closing arguments, the prosecutor made several statements regarding Ms. Scott's statements to Agent Veltman. The prosecutor argued: "You heard Gloria Scott testify and what she testified to wasn't exactly what the statement was that she made on March 27." ROA, Vol. 4 at 165. The prosecutor then referenced Ms. Scott's denial that "Rodney White was the one she was going to visit" and stated to the jury:

> At any rate, George Veltman did take a statement from her, and you heard him on rebuttal tell you that Gloria Scott was coming into the prison to visit Rodney White and to give him the contraband. And she also told him that she received some money through the Western Union wire in which she received a couple hundred dollars to facilitate this effort.

*Id.* at 166.

Later, the prosecutor said:

> I would submit to you that the substantial step [for attempt] was the instructions to his sister to bring in the prohibited drug. You heard the statement of George Veltman to that effect, and you can read yourselves from the Government's Exhibit 12 that that's what happened in this case. And the – once that was set in motion, Gloria Scott was on her way to deliver these drugs to Rodney White, and there is no disputing the fact that the only one that Gloria Scott was going to visit was Rodney White.

*Id.* at 172.

Finally, the prosecutor argued in rebuttal: "Gloria Scott said on two separate

time the trial court decided to admit the evidence or at any other time and did not object to the prosecution's use of the evidence during its closing argument. As a result, we may review these claims only for plain error. *United States v. Roberts*, 185 F.3d 1125, 1143 (10th Cir. 1999).

Plain error review is appropriate even though defendant White proceeded at trial pro se. The record indicates that the trial court thoroughly informed defendant White of the nature of the charges, the complexity of the trial, and the issues involved. The court also informed defendant White of the risks he was assuming by proceeding pro se and attempted to persuade him that he should not run the risk of doing so. Despite full knowledge of the potential risks, defendant White opted to represent himself at trial with the help of advisory or stand-by counsel. Thus, he "intelligently and voluntarily waived his Sixth Amendment right of active participation and assistance of trial counsel." *United States v. Pinkey*, 548 F.2d 305, 311 (10th Cir. 1977). By doing so, "he acquiesced in and subjected himself to the established rules of practice and procedure in federal

---

occasions she brought the drugs in for Rodney White. I will leave it to you. Thank you." *Id.* at 176.

For purposes of this order, we will presume that these comments establish that the government used Ms. Scott's hearsay statements as substantive evidence in its closing argument to prove the offense.

criminal trials." *Id.* As we have previously stated, a pro se criminal defendant is entitled to no greater rights than a defendant represented by counsel:

> The hazards which beset a layman when he seeks to represent himself are obvious. He who proceeds pro se with full knowledge and understanding of the risks does so with no greater rights than a litigant represented by a lawyer, and the trial court is under no obligation to become an "advocate" for or to assist and guide the pro se layman through the trial thicket.

*Id.* (citations omitted).

Under the plain error standard of review, there must be "(1) an 'error,' (2) that is 'plain,' which means 'clear' or 'obvious' under current law, and (3) that 'affect[s] substantial rights.'" *United States v. Fabiano*, 169 F.3d 1299, 1303 (10th Cir. 1999)(quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). For an error to impact substantial rights, typically "[i]t must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. Significantly, the defendant bears the burden of proving that the error had such an effect. *Id.* If all three conditions are met, an appellate court may then exercise its discretion to correct the forfeited error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson*, 520 U.S. at 467 (quoting *Olano*, 507 U.S. at 732).

In this action, we are far from convinced that defendant White has satisfied the first two prongs of the plain error analysis and established that the trial court erred in not providing a limiting instruction *sua sponte* or in not stopping the

- 11 -

prosecution from referencing Ms. Scott's prior inconsistent statements for substantive purposes during its closing. The defendant may well have made a tactical decision not to request a limiting instruction or object during closing argument because to do so would have drawn undue attention to the evidence in question. The trial court, therefore, would have undercut the defendant's strategy by inserting a limiting instruction on its own accord or stopping the prosecution during closing argument.

However, we need not address those prongs because it is clear that defendant White has not met his burden of establishing that the alleged errors impacted his "substantive rights." That is, he has not established that the alleged errors affected the outcome of the district court proceeding. The evidence at trial establishing that defendant White knew his sister was bringing drugs to him in prison was not limited to Ms. Scott's statement to Agent Veltman at the time of her arrest. FBI Agent Martin Daniell testified that defendant White confessed to knowing about Ms. Scott's actions. Specifically, Agent Daniell testified that during an interview with defendant White nearly two years after the incident, defendant White told him that he contacted his sister, Gloria Scott, by telephone and asked her to bring drugs into the prison. Agent Daniell also testified that defendant White told him that he provided his sister with Lisa Sorapuru's phone number, that Lisa and his sister had "hooked up," and that his sister had been

given the narcotics. In light of this other evidence properly admitted at trial, we conclude that the arguably improper use of Ms. Scott's testimony during closing argument did not affect defendant White's substantial rights or call into doubt the underlying fairness of the entire trial.

Moreover, in a case involving similar circumstances, *United States v. Jamieson*, 806 F.2d 949 (10th Cir. 1986), we declined to exercise our discretion to correct alleged errors because the errors did not seriously affect "the fairness, integrity, or public reputation of the judicial proceeding." *Id.* at 952. We reach a similar conclusion here. In *Jamieson*, the defendant was convicted of distributing controlled substances. *Id.* at 950. On appeal, one of his two grounds for reversal concerned the government's use of certain of his medical records. *Id.* at 951. Although the medical records were properly admitted to impeach a witness on cross-examination, the defendant argued that the district court erred by permitting the prosecution to later use the medical records during closing arguments as substantive evidence to prove essential elements of the crimes charged and by not instructing the jury that the medical records were being used only for impeachment purposes. *Id.* at 952-53. We disagreed. We first noted that our review was limited to a plain error analysis because the defendant made no specific objection at trial to the use of the medical records in the government's closing argument and did not ask for a limiting instruction. Under that analysis,

we concluded that the medical records were properly admitted as evidence for impeachment purposes and "any error resulting from their possible substantive use was not so egregious as to require reversal." *Id.* at 952.

In this action, Ms. Scott's prior inconsistent statements were initially admitted to impeach her. At trial, Ms. Scott testified that her brother had no knowledge that she was attempting to bring drugs into the prison. This testimony contradicted her prior statement to Agent Veltman at the time of her arrest at the prison. Thus, the district court properly permitted Agent Veltman to testify as to the prior inconsistent statements for the limited purpose of attempting to impeach Ms. Scott. As in *Jamieson* , impeaching Ms. Scott's testimony on the central issue in the case would necessarily have suggested that the opposite of her testimony was in fact the truth. Thus, any substantive use of Ms. Scott's prior inconsistent statements was not so egregious as to require reversal.

We also conclude that the district court did not commit plain error in failing to instruct the jury that it should consider Ms. Scott's prior inconsistent statements only for impeachment purposes. The district court provided the jury with a general instruction regarding bias and impeachment. Also, the district court instructed the jury that statements, arguments, and questions by counsel are not evidence. Considering the circumstances, the district court did not commit plain error in failing to provide a separate limiting instruction regarding Ms.

Scott's hearsay statement.  As we stated in *Jamieson*, failure to give a limiting instruction is generally held not to be plain error.  806 F.2d at 953 (quoting *United States v. Bermudez*, 526 F.2d 89 (2d Cir. 1975)(citation omitted)).

## CONCLUSION

In sum, we find no plain error in not providing a limiting instruction regarding Ms. Scott's hearsay statement or in the prosecutor's reference to Ms. Scott's prior inconsistent statements in his closing argument.  The judgment of the district court is therefore AFFIRMED.

Entered for the Court

John W. Lungstrum
District Judge