IN THE
# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

GIOVANI FUSTER MELENDEZ, *Appellant.*

No. 1 CA-CR 20-0066
FILED 7-25-2023

Appeal from the Superior Court in Maricopa County
No.  CR2019-104831-001
The Honorable Stephen M. Hopkins, Judge (Retired)

**REVERSED AND REMANDED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Dawnese Hustad
*Counsel for Appellant*

---

## OPINION

Judge Michael J. Brown delivered the opinion of the Court, in which Presiding Judge Jennifer M. Perkins and Chief Judge David B. Gass joined.

---

**B R O W N**, Judge:

¶1        Giovani Melendez appeals from his convictions and sentences for one count of aggravated assault and five counts of endangerment.  Counsel for Melendez filed a brief in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), advising us there were no meritorious grounds for reversal. Melendez had the opportunity to file a supplemental brief in *propria persona* but did not do so.  Our obligation is to review the entire record for reversible error, *State v. Clark*, 196 Ariz. 530, 537, ¶ 30 (App. 1999), viewing the evidence in the light most favorable to sustaining the convictions and resolving all reasonable inferences against Melendez, *State v. Guerra*, 161 Ariz. 289, 293 (1989).

¶2        After our initial review of the record, we ordered the parties to brief, *inter alia*, whether the State's references to Melendez's refusal to answer certain questions during custodial interrogation violated his constitutional rights and whether fundamental, prejudicial error occurred. *See Penson v. Ohio*, 488 U.S. 75 (1988).  Applying established principles from Arizona case law and *Doyle v. Ohio*, 426 U.S. 610 (1976), we hold that such error occurred when the State cross-examined Melendez about his selective silence and then asked the jury to hold that silence against him during closing argument.  Thus, we reverse and remand for a new trial.

## BACKGROUND

¶3        While signing a new lease for an apartment together, Melendez and his mother met a pastor touring the same apartment building.  After moving into the building, the pastor hosted services, which Melendez's mother started attending and on occasion he joined her. Through this connection, Melendez briefly met the pastor's son, A.G. Melendez and his mother later moved to a different apartment complex after their lease ended.

¶4          Several months after their move, A.G. was walking towards his apartment when he noticed a car drive up and park nearby.  The driver, Melendez, exited the car and called out to A.G., asking if A.G. "was the pastor's son."  A.G. walked towards Melendez, who pulled out a handgun and fired at A.G. multiple times, without striking him.  Police found bullet marks on the outside wall of a nearby apartment where a family of five were present when the shooting occurred.

¶5          After Melendez was taken into custody, a detective read him his *Miranda* rights.  *See Miranda v. Arizona*, 384 U.S. 436, 467–73, 479 (1966).  The detective explained that she wanted to get Melendez's "side of the story."  She then asked him several background questions, including his name, birthdate, phone number, information about his employment, and whether he had previous interactions with A.G. or the pastor.  Melendez answered each of those questions, and he told the detective he had moved from Puerto Rico about 17 months earlier.

¶6          The detective then asked why he went to the apartment complex and fired shots at A.G., to which Melendez responded, "I want to hold some stuff I want to say."  Several minutes later, she asked whether Melendez felt like he needed to protect himself from A.G. and Melendez repeated, "I still want to hold off on some information."  This pattern continued through much of the interview:

> Detective:  Do you believe that you committed a crime today?
>
> Melendez:  I still want to hold myself on some things.
>
> Detective:  That's fine.  So did, did you shoot at somebody today?
>
> Melendez:  I would hold information.
>
> Detective:  Okay.  So we'll set that aside.

¶7          About halfway through the 30-minute interview, the detective told Melendez that he would be going to jail because he committed a crime.  Melendez replied that he felt blindsided, and the detective asked Melendez to clarify which parts about the alleged crime he was not sure about so she could better explain things to him.  Melendez said he was confused about what the pastor was telling the police and the detective clarified that the pastor was not saying anything.  The detective explained that people heard Melendez ask A.G. if he was the pastor's son, so she asked, "do you have a problem with [A.G.]?"  Melendez answered

that he "barely talked to them," and the detective inquired why he was asking about the pastor, to which Melendez replied, "I'm passing this question." The exchange continued as follows:

> Detective: I'm just so confused then, why would you go over there with a gun?
>
> Melendez: That's all I want to say about my relationship with the pastor and the pastor's son.
>
> Detective: Okay. Is there somebody else that you were after and not them?
>
> Melendez: Sorry, I apologize, I don't mean to ignore you. I want to pass again.
>
> Detective: Okay. I'll make sure I make that clear, you have no problem with the pastor or his family.
>
> Melendez: Yeah, I have never had any trouble with them.
>
> Detective: Okay. I guess I'll just wonder why you went over there with a gun. You were upset today?
>
> Melendez: Um, I'll pass again.
>
> Detective: Okay. Alright, is there anything else you want to tell me or you feel like I forgot to ask you about today? Did you work today?
>
> Melendez: Yes, I went to work.
>
> Detective: Okay. Did anything happen before you went to the pastor's house or apartment? Did anything happen today to make you mad?
>
> Melendez: I'll pass this question, I'm sorry.

¶8        When the detective asked Melendez if he remembered what happened, he said he "just want[ed] to hold everything for now." She responded, "[a]nd that's fine. That's your right." The detective explained that Melendez had one last chance to tell her his side of the story, and then left the room. When the detective returned, she explained again that Melendez would be going to jail. Melendez then shared his version of what occurred. He explained it was his habit to drive around his old

4

neighborhood, and when he saw A.G., he got out of his car (because his window did not roll down) and asked if A.G. was the pastor's son. A.G. responded "Oh, que pasa cabron" and walked aggressively towards Melendez, while moving his hand as if he were "looking for something." Melendez told the detective that he "reacted to [A.G.] being hostile towards [me] and walking towards me."

¶9 The State charged Melendez with aggravated assault, a class 3 dangerous felony, and five counts of endangerment, all class 6 dangerous felonies. At trial, A.G. testified that he approached Melendez, who had his hand behind his back, and when A.G. moved his hand to greet Melendez, Melendez pulled out the gun. A.G. testified that Melendez fired at him several times, prompting A.G. to run away. A friend of A.G. who saw the incident testified to a similar version of events.

¶10 Melendez elected to testify at trial and his testimony generally tracked his interview with the detective. Melendez explained that Spanish is his first language, and that the term 'cabron' represents a "male goat. . . . So, you know, it can be used – at least in Puerto Rico it can be used as an offense." Melendez also explained that the phrase could be used "if you are cool with a person and you're friends" to convey a greeting, like "what's up, dude?" Because he and A.G. were not well acquainted, Melendez testified that he was "worried" because A.G. "was walking towards me while he said the words" with a body expression and aggressive tone which made him feel as if A.G. "was going to attack" him. Melendez testified that A.G. moved his hand towards his waist "like he was going to look for a gun," and Melendez fired his own gun because he believed his life was in danger.

¶11 On cross-examination, the prosecutor questioned Melendez about his post-arrest, post-*Miranda* interview, including the following:

> Prosecutor: Isn't it true that while you were talking to [the detective] *you never claimed self-defense* until after she told you[,] you were going to jail for shooting at the pastor's son?
>
> Melendez: She just happened to bring me that information as I was already decided to come in that it was self-defense.
>
> Prosecutor: Okay. But, again, after she told you you're going to jail for shooting at the pastor's son, that's when you're claiming that it was self-defense?

Melendez: 'Cause she told me: I will be right back, you know, and – and she told me that it was like my last chance to say something, and she went outside. And then when she came, I had decided to – to tell her that it was self-defense.

Prosecutor: Okay. I'm glad you brought that up. So isn't it true that you were asked *probably ten times* direct questions such as: What made you go over there and shoot today? Do you remember her asking you that?

Melendez: Yes.

Prosecutor: Do you remember saying: *I want to hold some of what I want to say?*

Melendez: Yes.

Prosecutor: And do I understand correctly that when you're saying: *I want to hold some of what I want to say, that means I don't want to answer that question right now?*

Melendez: Well, I – *I was passing on the opportunity to answer the question at the moment.*

Prosecutor: Okay. *So you passed on the opportunity to answer the question.* And then, you know, she asked you, again: Did you feel like you had to protect yourself today from the pastor's son, and then your answer was: *I still want to hold to some of that information?*

Melendez: Yeah.

Prosecutor: Right? That's about ten minutes into the conversation. And then she asked you, you know: Is there anything you want to tell me? *No answer at that point. Right?*

Melendez: When she asked me that, I don't recall exactly what I answered.

Prosecutor: Okay. Do you remember her asking you if you understood what is a crime, that it's a crime to shoot at somebody? Do you remember her asking you that?

Melendez: Yes.

Prosecutor: Okay. And then do you remember her asking you: Do you believe you committed a crime today?

Melendez: I think I do.

Prosecutor: And then your answer was: *I still want to hold myself on some things?*

Melendez: Yes, I guess that's what I answer, yeah.

Prosecutor: And then, again, she asked you: Did you shoot at somebody today, and your answer was: *I'd like to hold that information?*

Melendez: Yes.

Prosecutor: And so this went on and on. She asked you – well, you were telling her, you wanted to clarify something, you don't have a problem with the pastor, you've never had a problem with his wife, never had a problem with his son. You know, one of them, I just saw him at the holidays. The other one, I just said hi. Then [the detective] asked you: Then why go over there with a gun, and, again, your answer was: *That's all I want to say about the pastor and the pastor's son; right?*

Melendez: I don't recall that answer.

Prosecutor: And then do you remember her asking you: Did anything happen before you went over to the pastor's son to make you mad?

Melendez: I think I do, yeah.

Prosecutor: Okay. And your answer to that was: *I'll pass this question, I'm sorry?*

Melendez: Yes.

Prosecutor: You mentioned that, you know, at some point she went – she was leaving, you said, and she said: Last opportunity?

Melendez: Yes.

Prosecutor: That was before she walked out to go get you some more water?

Melendez: Yes.

Prosecutor: And then still there *was no answer at that point?*

Melendez: No answer.

Prosecutor: But then when she returned and she told you you were going to be – going to jail for shooting at the pastor's son, then you decided that you wanted to tell her that it was self-defense; right?

Melendez: I was already decided because I think she had told me that, you know – you know, I think there was a comment as in, I didn't want to cooperate, and that wasn't – that wasn't – you know, as I didn't want it – you know, after, you know, the comment was said, I don't know how it was said about me not cooperating, and, you know, I didn't want [her] to think that I don't want to cooperate. *I just saw it as a way of remaining silent at the moment 'cause I have my right*, and I was still, you know – my mind was still, you know – I – in this belief of what was going on, so I was just waiting, you know, for, you know, at least – you know, I wanted to – her to first talk to me about, you know, to tell me everything. You know, I want [her] to talk to me about the situation.

Prosecutor: So you wanted her to tell you what she knew before you would make a claim of self-defense; is that what you're saying?

Melendez: I wanted to – you know, it's like I had told my attorney, I don't – I didn't know what to say. I was – you know, I don't know, I never been in this situation, so I was – I can say I was kind of lost.

(Emphasis added.)

¶12 In closing arguments, the prosecutor played audio clips from the interview and emphasized Melendez's decision not to answer certain questions posed by the detective and his failure to offer a timely explanation for his conduct:

I counted *ten or 11 times* that he is asked a direct question about: Why did you go over there and shoot? Why did you have a gun? Why did you ask that question?

And his answer was something along the lines of: *I want to hold that information. I'm going to pass on that question. I mean, if you were shot at or if you believe that you were going to be shot at, and that's why you discharge your own gun at somebody four times, once the police do get there, don't you want to tell them that? Wouldn't you want to say: Hang on one second, you have me in handcuffs, you put me in here, but here's what happened. But especially once you start getting asked these questions, it's like - - can we have the audio now[?]*

(Whereupon a recording was played, not taken down by the court reporter.)

If you remember when the Defendant was testifying yesterday and I asked him why, why are you saying: Hey are you the pastor's son? His answer was: Well, I wanted to strike a friendly conversation with him. I was just going over there, saw him.

*Why not tell the police that? Why did you ask that question? Why did you ask: Are you the pastor's son? Wasn't that the answer then as well, or is the Defendant still trying to figure out what his excuse is going to be as to why he went over there and asked: Are you the pastor's son and then shot at [A.G.].*

Another question: Was there someone else you were after? *Just what would the reasonable person respond if you really just shot in self-defense? Would a reasonable person say: I would like to not answer that question, or would the answer be: Absolutely not. I was not after anyone.*

(Whereupon a recording was played for the jury, not taken down by the court reporter.)

Again, you do have the entire interview. These are just clips that I put on here, but you can listen to the entire thing.

Here's another question: If he's just driving and he just went over there for no reason looking for something to do and wanted to strike a friendly conversation, *why are we*

*withholding information* about did anything happen to make you go over or to make you mad? . . .

Notice how when he's asked: Did you go to work today or did you work today, the answer is immediately "yes." There is no problem with that question cause that's not asking why you went over and shot at someone and – *no, he doesn't have to think about what he's going to say*.

(Emphasis added.)

**¶13** Defense counsel did not object at trial to the prosecutor's references about Melendez's refusal to answer certain questions during the interview. During deliberations, the jury informed the court that it could not reach a unanimous decision on one of the six counts and asked for further guidance. Acknowledging that an impasse instruction should not be given prematurely, the court stated its inclination to give the instruction because the case was not "very complicated." Neither party objected, and after receiving the impasse instruction the jury later found Melendez guilty as charged.

**¶14** The superior court sentenced Melendez to presumptive, concurrent terms of 7.5 years' imprisonment for aggravated assault, a class three felony, and 2.25 years imprisonment for each count of endangerment, a class six felony. Melendez timely appealed, and we have jurisdiction under A.R.S. § 12-120.21(A)(1).

**DISCUSSION**

**¶15** Melendez argues the State violated his constitutional rights under the Fifth and Fourteenth Amendments when the State attacked his "exercise of his right to remain silent," even though he exercised it selectively. Melendez contends that under *Doyle*, 426 U.S. 610, the State's cross-examination and comments during closing arguments violated his right to due process under the Fourteenth Amendment. Because Melendez did not object at trial, we review for fundamental error. *State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018). Under that standard, we first determine whether trial error exists, and then whether the error is fundamental. *Id.* at 142, ¶ 21. If fundamental error exists, the defendant must then show resulting prejudice. *Id.* The "defendant bears the burden of persuasion at each step." *Id.*

## I. Constitutional Rights Relating to Silence

**¶16** To safeguard a suspect's right against self-incrimination under the Fifth Amendment, a suspect in custody must be advised by police of his right to remain silent, the right to retain or have an attorney appointed, and that anything the suspect says can be used against him in court. *Miranda*, 384 U.S. at 467–73, 479. The *Miranda* warnings are designed to ensure, in part, that a suspect understands he may exercise his rights throughout the interrogation as well as consequences of forgoing the Fifth Amendment privileges:

> It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.

*Id.* at 469. A waiver of *Miranda* rights must be made voluntarily, knowingly, and intelligently. *Id.* at 444.

**¶17** After *Miranda* was decided, but before *Doyle*, our supreme court decided several cases involving the extent to which a prosecutor may comment on a defendant's exercise of silence during custodial interrogation. For example, in *State v. Shing*, 109 Ariz. 361 (1973), the defendant was apprehended by police at the scene of a crime, informed of his *Miranda* rights, and asked if he wanted to speak with the authorities, to which he responded "Yea." *Id.* at 362–64. But when an officer began to ask specific questions about the crime, the defendant answered that he "didn't want to discuss" how many people were involved, and when asked if he would identify other suspects he simply answered "no." *Id.* at 364. At trial during closing arguments, the prosecutor commented: "Perhaps, the most significant thing about [defendant's] behavior was his silence. He had an opportunity to explain his presence at the airstrip. He didn't do so. He had an opportunity to identify someone else who might or might not be involved." *Id.*

**¶18** The supreme court held that the prosecutor's comments about the defendant's post-arrest silence constituted fundamental error, reasoning in part:

> To hold that [a] defendant may, after being warned of his right to remain silent, have that silence used against him would nullify the warning required by *Miranda*, . . . the

warning would have to be amended to inform the defendant
that not only what he says may be used against him, *but what
he doesn't say will also be used against him*.

*Id.* at 365 (emphasis added). Given the strength of the State's evidence,
however, the court determined the error was harmless beyond a reasonable
doubt. *Id.*

¶19 In *State v. Anderson*, 110 Ariz. 238 (1973), the prosecutor asked
the defendant a question about his failure to share his version of events
before trial. *Id.* at 239. During closing, the prosecutor referred to the
exchange on cross-examination twice, emphasizing that the defendant had
maintained his silence up until trial. *Id.* Acknowledging that cases were
not unanimous on the issue, the *Anderson* court clarified that legitimate
cross-examination serves to call attention to credibility, but that rationale
does not support questioning a defendant about his "silence at the time of
arrest" because it is "not an inconsistent or contradictory statement." *Id.* at
239–41 (citing *Johnson v. Patterson*, 475 F.2d 1066, 1067–68 (10th Cir. 1973)).
Rather, silence at the time of arrest is the exercise of a constitutional right
without qualification, and allowing the prosecutor to use that fact at trial
would make the assertion of the right costly. *Id.* at 241.

¶20 Our supreme court held that the "one question and answer,"
along with the prosecutor's comments to the jury, constituted fundamental
error, and disapproved of anything to the contrary in *Benton* and *Belcher*.
*Id.*; *State v. Benton*, 109 Ariz. 427, 428–29 (1973) (finding that defendant
raised no question of fundamental error based on prosecutor's question
about whether defendant "had told this to anyone else"); *State v. Belcher*,
108 Ariz. 290, 292 (1972) (rejecting defendant's contention that the trial court
erred by allowing prosecutor's impeachment "by silence"). Based on
overwhelming evidence, the court concluded the error was harmless
beyond a reasonable doubt but cautioned that by "approaching the
precipice of fundamental error, the prosecution runs the risk of having an
otherwise good case reversed when, on appeal, the evidence of guilt is less
than overwhelming." *Anderson*, 110 Ariz. at 241.

¶21 In *State v. Ward*, 112 Ariz. 391 (1975), the defendant argued he
had been denied a fair trial when the prosecutor, while cross-examining
him and during closing arguments, referred to the defendant's post-arrest,
post-*Miranda* silence. Specifically, after the defendant testified he had acted
out of self-defense, the prosecutor asked him "whether a man acting in
self-defense would have naturally told the police of his defense." *Id.* at 392.
And during closing, the prosecutor raised this point twice. *Id.* While the

State conceded the prosecutor's statements were improper, it argued against reversal given the evidence against the defendant. *Id.* The court disagreed because it could not conclude, in the "presence of prosecutorial error of this nature and degree," that the error was non-prejudicial. *Id.*

**¶22** In 1976, the United States Supreme Court considered whether the prosecution may use a defendant's post-arrest, post-*Miranda* silence to impeach a defendant's exculpatory testimony at trial. *See Doyle*, 426 U.S. at 610–11. After the defendants in *Doyle* were given *Miranda* warnings, the defendants were mostly silent in the face of police questioning. *See id.* at 612–14, 627–28 (Stevens, J., dissenting) (noting that one defendant briefly responded and asked why he was being arrested). In each of their trials the defendants testified, and on cross-examination the prosecutor impeached their exculpatory testimony with evidence of their silence during police questioning, such as asking whether they had protested their "innocence" to the police after being arrested. *Id.* at 613–14, 614 n.5. And in both trials, the prosecutor pointed out the post-arrest silence during closing arguments. *Id.* at 614 n.5.

**¶23** The Court held that the *Miranda* decision compelled rejection of the state's position that such questioning and argument were needed "to present to the jury all information relevant to the truth" of the defendants' exculpatory story. *Id.* at 617. The court explained that every post-arrest silence is "insolubly ambiguous" based on what the government is required to advise a suspect under arrest. *Id.* at 617. And "it would be fundamentally unfair and a deprivation of due process" to allow a suspect's silence to be used to impeach an explanation later offered at trial because the *Miranda* warnings do not inform him that his silence, just as his words, may be used against him. *Id.* at 618–19. "Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case." *Id.* at 619 (citation omitted). The Court held that using the defendants' silence at the time of arrest, for impeachment purposes at trial, violated the Due Process Clause of the Fourteenth Amendment because the *Miranda* warnings implicitly assure a suspect his silence will carry no penalty. *Id.* at 610, 619. The Court reversed the defendants' convictions. *Id.* at 620.

**¶24** Since *Doyle*, the Court has reaffirmed that the use of a defendant's post-arrest, post-*Miranda* silence, for impeachment purposes at trial, violates due process. *See Greer v. Miller*, 483 U.S. 756, 763 (1987); *see also Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993). The Court has also clarified when a suspect advised of *Miranda* rights may be impeached about his statements. *See, e.g., Anderson v. Charles*, 447 U.S. 404, 408–09 (1980) (holding that the government may cross-examine defendants about prior

inconsistent statements, because such questions merely seek to elicit an explanation, in contrast to questions that are "*designed to draw meaning from silence*") (emphasis added).

¶25      The principles announced in *Doyle* were not surprising, at least for Arizona courts. *See State v. Calhoun*, 115 Ariz. 115, 117 (App. 1977) (noting that our supreme court "had anticipated *Doyle* in a line of cases of which [*Anderson*, 110 Ariz. at 238], is exemplary."). And for the most part, our appellate courts have continued to reinforce the principle that prosecutors cannot penalize a defendant at trial by bringing to the jury's attention that he exercised his right to decline to answer police questions. *See, e.g.*, *State v. Carrillo*, 156 Ariz. 125, 128 (1988) ("Arizona courts have recognized that the protection against self-incrimination includes freedom from adverse consequences flowing from defendant's exercise of his right. Thus, the prosecutor may not raise an inference of defendant's guilty mind by remarking upon the silence of a suspect who exercised his *Miranda* rights.").

¶26      In *State v. Sorrell*, 132 Ariz. 328 (1982), our supreme court considered whether the prosecutor's various references to the defendant's post-arrest silence constituted reversible error. The arresting officer testified that after being informed of his *Miranda* rights, the defendant said he did not wish to speak and wanted to call his lawyer. *Id.* at 329. A second officer testified that about 90 minutes after being placed in a holding cell, the defendant contacted him and provided a statement about his innocence after being re-read his *Miranda* rights. *Id.* Along with these references, the prosecutor emphasized during its opening and closing arguments the defendant's failure to provide his exculpatory story until he had "a little time to think about what he was going to say to officers." *Id.*

¶27      Citing various Arizona cases, the court found the references to the defendant's post-arrest silence were "clearly fundamental error, and it has been held so on numerous occasions." *Id.* Recognizing the reasoning in *Doyle*—that such references are a deprivation of due process—the court rejected the State's argument that the comments were permissible because the defendant "did not remain silent." *Id.* at 329–30. The court explained that "an accused may change his mind after he has elected to remain silent and decide to speak . . . but *we do not believe that he should be prejudiced by this later change of mind*." *Id.* at 330 (emphasis added). Whether a defendant speaks after remaining silent for some time, or never makes a statement, a comment on such silence is improper because he is relying on *Miranda's* promise that he had a right to remain silent. *Id.* "[C]omment on the exercise

of that right is proscribed by the opinions *of this court* and the United States Supreme Court." *Id.* (emphasis added).

**¶28** In *State v. Routhier*, 137 Ariz. 90, 93 (1983), an officer read the defendant his *Miranda* rights before questioning him. The defendant said he remembered a few details about the crime, but when asked to elaborate he requested an attorney and questioning ceased. *Id.* at 93–94. At trial, the prosecutor asked the defendant during cross-examination if at any point he had told police that he acted in self-defense, to which the defendant replied, "I don't think so. No, I didn't discuss any of the details with them." *Id.* at 95. The prosecutor continued to ask the defendant why he had not provided the police more information and referenced such silence on redirect examination of the interrogating officer. *Id.*

**¶29** The defendant argued on appeal he was denied due process by the prosecutor's references to his post-arrest silence. *Id.* Consistent with Arizona case law showing that a defendant's silence "cannot be used against him," our supreme court held that the prosecutor improperly asked "questions on matters about which the [defendant] had not made any comment *or given any information*." *Id.* at 95–96 (emphasis added). Explaining that "[*Anderson*, *Shing*, *Ward*] are grounded on the principle that the *Miranda* warnings implicitly assure a person that the exercise of his rights carries no penalty and cannot be used against him," the court determined the State violated the defendant's Fifth Amendment right to silence and the error was fundamental. *Id.* at 95–96. The court also rejected the State's argument that the defendant had waived his constitutional rights, pointing out that a person is not "inextricably bound" by waiver. *Id.* at 96.

**¶30** Applying these principles, we turn to whether Melendez's right to due process was violated when the State cross-examined him about declining to answer certain questions during his interview with the detective and urged the jury during closing arguments to draw inferences from that exchange. In doing so, we recognize that the Supreme Court has not yet addressed whether *Doyle* applies to selective silence, leaving federal and state courts divided on the question. *See* Chase Cunningham, Note, *Noncustodial Selective Silence: Existing Bases for Newfound Protection*, 56 U. Louisville L. Rev. 463, 472–78 (2018).[1] For the reasons explained below,

---

[1] For jurisdictions that have generally recognized the right of a defendant to selectively exercise silence during custodial interrogation, *see, e.g.*, *Hurd v. Terhune*, 619 F.3d 1080, 1087 (9th Cir. 2010); *United States v.*

we agree with courts holding that the prosecution may not penalize a suspect who has selectively exercised his right to remain silent in responding to certain questions or requests during custodial interrogation, whether by specifically declining to answer or by staying mute. The reasoning from those courts aligns more closely with Arizona's case law and reflects the principles of fundamental fairness and due process applied in *Doyle*.

## II. Application of Arizona Case Law and *Doyle*

### A. Waiver

**¶31** The State argues Melendez's selective silence does not warrant constitutional protection because he did not remain completely silent; instead, *he spoke*. *See, e.g.*, *State v. Talton*, 497 A.2d 35, 44 (Conn. 1985) ("By speaking, the defendant has chosen unambiguously not to assert his right to remain silent."). Thus, the State contends he "voluntarily waived his rights" by answering some questions and did not invoke his right to remain silent when refraining from answering others.

**¶32** The State has the burden of proving waiver of a constitutional right. *See Brewer v. Williams*, 430 U.S. 387, 404 (1977). For waiver to be made "voluntarily, knowingly and intelligently," the suspect must (1) choose to

---

*Moore*, 104 F.3d 377, 389 (D.C. Cir. 1997); *United States v. Scott*, 47 F.3d 904, 907 (7th Cir. 1995); *United States v. Canterbury*, 985 F.2d 483, 486 (10th Cir. 1993); *United States v. Williams*, 665 F.2d 107, 109–10 (6th Cir. 1981); *United States v. Ghiz*, 491 F.2d 599, 600 (4th Cir. 1974); *People v. Castro*, 521 P.3d 1035, 1040, ¶ 29 (Colo. App. 2022); *State v. McCallie*, 369 P.3d 103, 109, ¶¶ 25–26 (Utah Ct. App. 2016); *Bartley v. Com.*, 445 S.W.3d 1, 9 (Ky. 2014); *Coleman v. State*, 75 A.3d 916, 924 (Md. App. Ct. 2013); *State v. Silva*, 81 P.3d 889, 893 (Wash. Ct. App. 2003).

For jurisdictions rejecting selective silence, *see, e.g.*, *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 103–05 (3rd Cir. 2012); *United States v. Pando Franco*, 503 F.3d 389, 396–97 (5th Cir. 2007); *United States v. Burns*, 276 F.3d 439, 441–42 (8th Cir. 2002); *United States v. Pitre*, 960 F.2d 1112, 1125–26 (2d Cir. 1992); *United States v. Goldman*, 563 F.2d 501, 502–04 (1st Cir. 1977); *People v. Bowman*, 136 Cal. Rptr. 3d 119, 127–28 (Cal. Ct. App. 2011); *State v. Fluker*, 1 A.3d 1216, 1222–23 (Conn. App. Ct. 2010); *People v. King*, 892 N.E.2d 1196, 1204–06 (Ill. App. Ct. 2008); *People v. McReavy*, 462 N.W.2d 1, 7–9 (Mich. 1990); *State v. Smart*, 756 S.W.2d 578, 581 (Mo. Ct. App. 1988).

relinquish the right freely and (2) the waiver must be made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The record supports a finding of waiver under the first prong because Melendez voluntarily spoke with the detective and nothing suggests he was intimidated, coerced, or deceived. *See id.* On the second prong, however, during much of the interview, Melendez repeatedly told the detective he did not want to talk about the shooting, and the detective affirmed that was his right.

**¶33** Nothing in the *Miranda* warnings informs a suspect that if he relies on his Fifth Amendment right to be silent, completely or partially, his exercise of that right can be used against him at trial. Logically, this means a court cannot properly find a suspect has "waived" that consequence. *See Moran*, 475 U.S. at 421 (requiring "full awareness" of the right being abandoned and its consequences). Instead, a suspect would reasonably presume the opposite—that he can exercise his right to remain silent by refraining from answering all or some questions posed to him. *See Doyle*, 426 U.S. at 617–19; *see also Carrillo*, 156 Ariz. at 131 ("By informing a suspect of the *Miranda* rights, the state makes an implied promise that there will be no penalties if the suspect uses those rights.").

**¶34** As our supreme court explained in *Shing*, the warnings required by *Miranda* would have to be amended to inform a suspect that not only what he says may be used against him, but what he does *not* say will also be used against him. *Shing*, 109 Ariz. at 365. The warnings have not been amended, and allowing the State to penalize a defendant at trial for his earlier silence when he was not informed of that consequence would improperly relieve the State of its burden to prove waiver. It would also underscore the "imbalance in the delivery of *Miranda* warnings," given that the warnings "emphasize the dangers of choosing to speak . . . but give no warning of adverse consequences from choosing to remain silent." *South Dakota v. Neville*, 459 U.S. 553, 565 (1983).

**¶35** While a suspect need not know and understand "every possible consequence of a waiver," *Colorado v. Spring*, 479 U.S. 564, 574 (1987), interpreting *Miranda* to allow the jury to hear comments at trial about a suspect's silence, whether partial or complete, would make the assertion of the right more costly by, in essence, allowing a suspect to incriminate himself without being aware of doing so. *See Carrillo*, 156 Ariz. at 131 (explaining that courts do not penalize a "defendant for exercising his *Miranda* rights"). Thus, the State has not met its burden of showing that by answering some questions, and declining to answer others, Melendez

knowingly and intelligently waived his right to refrain from answering certain questions throughout the interrogation and to be free from penalty at trial for exercising that right. *See Miranda*, 384 U.S. at 445 ("The mere fact that [a criminal suspect] may have answered some questions . . . does not deprive him of the right to refrain from answering any further inquiries."); *Anderson*, 110 Ariz. at 241 (allowing prosecutors to point to a defendant's exercise of silence would make the assertion of the constitutional right costly).

¶36        When a suspect relies "on the express statement in the *Miranda* warnings that he had a right to remain silent," then "comment on the exercise of that right is proscribed by the opinions of [the Arizona supreme] court and the United States Supreme Court." *Sorrell*, 132 Ariz. at 330. A suspect who answers only some of law enforcement's questions has not waived his ability, based on due process, to exercise his Fifth Amendment right to silence when responding to other questions. *See, e.g.*, *United States v. Williams*, 665 F.2d 107, 109–10 (6th Cir. 1981). Melendez exercised that right when he repeatedly told the detective he did not want to address certain questions.

¶37        Like other jurisdictions declining to extend *Doyle* to selective silence, the State seems to argue that a defendant must remain *completely* silent to claim the due process protections contemplated under *Doyle*. *See, e.g.*, *United States v. Burns*, 276 F.3d 439, 441–42 (8th Cir. 2002). Apparently under that view, if a suspect utters one word during police questioning — whether or not the statement has any relevance to his involvement in the crime — then any attempt to exercise silence throughout the rest of the interview is futile, absent cutting off *all* questioning or requesting counsel. *See* Stephen Rushin, Comment, *Rethinking Miranda: The Post-Arrest Right to Silence*, 99 Cal. L. Rev. 151, 163–66 (2011). Reading *Doyle* in proper context, the State's argument fails.

¶38        In *Anderson*, the Court explained that *Doyle* "involved two defendants who made no postarrest statements about their involvement in the crime." *Anderson*, 447 U.S. at 407; *see also Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) (stating that in *Doyle*, the defendant "made no statements" to the police). But *Anderson's* explanation, in a literal sense, is not true, at least as to one of the defendants. After being informed of his *Miranda* warnings, Mr. Doyle asked the police, "What's this all about?" and "exclaimed 'you got to be crazy,' or 'I don't know what you are talking about.'" *Anderson*, 447 U.S. at 407 n.2 (citations omitted); *see Doyle*, 426 U.S. at 613–614, 614 n.5. The later analysis in *Anderson* clarified why, in context, the Court treated the defendants as having made no statements when it

explained that the relevant post-arrest statements for purposes of a *Doyle* due process analysis are those "about [a defendant's] *involvement in the crime*." *See Anderson*, 447 U.S. at 407 (emphasis added); *see also State v. McCallie*, 369 P.3d 103, 108, ¶¶ 20–21 (Utah Ct. App. 2016) (considering whether the defendant's post-arrest statements fell into the "category of comments about his involvement in the interrogation" or "whether they [could] be fairly described as comments about his involvement in the crime").

¶39        Because Mr. Doyle's statements were uniformly treated as the equivalent of silence, they were not considered statements about his involvement in the crime. *See Anderson*, 447 U.S. at 407 n.2 ("Both the Court and the dissent in *Doyle* analyzed the due process question as if both defendants had remained silent."). Stated differently, the Court implicitly concluded that a suspect waives his *Miranda* rights on matters related to his involvement in a crime, but waiver is not triggered by comments about the interrogation itself. If the "you speak, you waive" rule (which the State in effect presses in its briefing) were viable, the Court presumably would have applied waiver and never reached the due process analysis in *Doyle*. Likewise, our supreme court presumably would have applied waiver in *Shing*, given that the defendant there briefly spoke before he specifically declined to answer other questions. *Shing*, 109 Ariz. at 364–65. Here, the State repeatedly referenced Melendez's refusal to answer certain questions, but his responses to those questions related to his *involvement in the interrogation*. They cannot be fairly described as comments about his "*involvement in the crime*." *See Anderson*, 447 U.S. at 407 (emphasis added).

¶40        And to the extent the State suggests that Melendez waived his right to exercise selective silence by saying "I'll pass" or similar wording, in deciding whether the State can later point to those responses at trial, there is no meaningful difference if a suspect shakes his head "no," says, "I don't want to answer," or is unresponsive. In each instance, a suspect is exercising his right not to respond, consistent with what he is told he can do at the outset of the interrogation. *See Hurd v. Terhune*, 619 F.3d 1080, 1089 (9th Cir. 2010) (stating that a suspect "need not utter a 'talismanic phrase' . . . . [I]t is enough if the suspect says that he wants to remain silent or that he does not want to answer that question"); *United States v. Velarde–Gomez*, 269 F.3d 1023, 1031–33 (9th Cir. 2001) (en banc) (holding that evidence of the suspect's lack of physical or emotional reaction when confronted with crime details was tantamount to evidence of silence). Melendez, speaking in his non-native language, conveyed his intent to exercise his right not to answer certain questions by repeatedly stating he wanted "to hold" or "to

pass" on some things, which the detective understood when she confirmed he had that right. *See Hurd*, 619 F.3d at 1089.

**¶41**     Moreover, adopting a strict rule that uttering a single word waives the due process protection recognized under *Doyle* would be unreasonable. For example, in *Hurd*, after answering various questions, the defendant declined the officer's request that he demonstrate how he was holding the gun during the alleged crime by saying, among other things, "I don't want to do that," "I can't," and "[n]o." *Hurd*, 619 F.3d at 1088–1089. In granting habeas relief, the *Hurd* court reasoned in part that when a suspect "remains silent or refuses to answer a question posed by police, that silence or refusal is inadmissible," and the law allows him "to refuse to be interviewed in a particular manner even if he has already waived that right with respect to the subject matter of the interrogation." *Id.* at 1082, 1088. To conclude that a suspect waives his right to *Doyle's* due process protection merely by telling the police "no" in response to a request to show or explain how or why a crime was allegedly committed is untenable. *See id.* at 1088–1089; *see also State v. Beaudet-Close*, 468 P.3d 80, 86 (Haw. 2020) (holding that the defendant, after he had provided "his side of the story" and answered the detective's questions, could not be penalized at trial for refusing to participate in reenactment of the alleged crime).

**¶42**     Finally, holding that a defendant automatically waives his right to decline to answer certain questions posed by police by merely speaking lacks compelling justification because it fails to recognize that a suspect should be permitted to exercise the right to silence without needing to cease cooperating with law enforcement altogether. *See Sorrell*, 132 Ariz. at 330 (permitting the State to comment on the timing of a defendant's silence "would mean that a defendant has more to lose by waiting and making a statement than he would if he never made a statement at all"); *Hendrix v. Palmer*, 893 F.3d 906, 924–95 (6th Cir. 2018) (explaining that *Doyle* does not cease to apply just because a "defendant makes *any* post-*Miranda* statement").

## B.     Invocation v. Exercise

**¶43**     According to the State, it is significant that Melendez never made "an unambiguous invocation of his right to remain silent and/or his right to counsel." The State suggests that Melendez surrendered any right to claim he relied on his constitutional rights when he was selectively silent, citing the Supreme Court's plurality opinion in *Salinas v. Texas*, 570 U.S. 178, 183 (2013) (holding that the privilege against self-incrimination is not self-executing).

20

¶44        The State improperly frames the right to remain silent as one which can only be exercised to cut off questioning.  But nothing in *Doyle* suggests the right to silence is an "all or nothing proposition."  *See Hurd*, 619 F.3d at 1087; *State v. Fuller*, 282 P.3d 126, 136, ¶¶ 36, 38 (Wash. Ct. App. 2012) (explaining that a suspect "may invoke the right to silence in response to *any* question posed by law enforcement" without police necessarily needing to cease an interview).  The notion that a suspect has only two choices (remain completely silent or invoke) overlooks what "invocation" commonly means in the context of custodial interrogation.  Generally, when courts reference a suspect who has "invoked" his constitutional rights during police questioning, the description reflects a suspect's assertion of either the Fifth Amendment privilege against self-incrimination or the Sixth Amendment right to counsel.  *See Salinas*, 570 U.S. at 183–84 (explaining the privilege against self-incrimination and requirements for invocation); *McNeil v. Wisconsin*, 501 U.S. 171, 177–78 (1991) (describing the purpose of the right to counsel and requirements for invocation).  Thus, the effect of *invocation* in those circumstances is the termination of all questioning.  *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010).[2]  To end an interrogation through invocation, a suspect must unequivocally and unambiguously communicate his desire.  *Id.*

¶45        Unlike invoking the right to cut off questioning and the right to speak with counsel, the privilege related to the due process right recognized in *Doyle* requires no affirmative communication; it is essentially self-executing.  *See McCallie*, 369 P.3d at 109, ¶ 25 (rejecting assertion that a suspect must unambiguously invoke his right to remain silent to trigger *Doyle's* "assurance that silence will carry no penalty").  A due process violation occurs when (1) state officials assure a defendant he has a certain right, (2) he exercises that right, and (3) "the prosecution uses the defendant's exercise of the right as evidence against him at trial."  *Engle v. Lumpkin*, 33 F.4th 783, 793 (5th Cir. 2022) ("[I]t is the defendant's *frustrated reliance* on an official assurance that violates the Constitution.").  Thus, a suspect who declines to respond to a question or request by staying mute, or otherwise communicates his desire not to address the question or

---

[2]        In *Berghuis*, the Supreme Court considered whether the defendant *invoked* his Fifth Amendment rights by remaining mostly silent for the first two hours and forty-five minutes of a three-hour police interview.  *Berghuis*, 560 U.S. at 375–76.  The issue addressed was whether his silence was enough to indicate to police that he wanted to invoke his right, under the Fifth Amendment, to cut off *all* questioning.  *See id.* at 380–81.  The defendant's silence was not introduced as substantive evidence at trial, nor did the Court decide its admissibility.

request, has *exercised* his right to be free from the State using that conduct against him at trial. *See Doyle*, 426 U.S. at 617–18.

**¶46** And no matter how we label a suspect's decision not to answer questions, just because a suspect does not *affirmatively invoke* his Fifth Amendment or Sixth Amendment rights does not mean the State may later penalize the suspect for whenever he exercises his due process right to refrain from answering certain questions during the interview. *See, e.g., United States v. Garcia-Morales*, 942 F.3d 474, 476 (9th Cir. 2019) ("[A] suspect who remains silent in response to certain questions may still claim protection under *Doyle* even if his silence falls short of the unambiguous declaration required to invoke the right to counsel under *Davis* or the right to cut off questioning."); *see also Hendrix*, 893 F.3d at 925 (holding that protecting a defendant's exercise of silence reflects the rule that the prosecution cannot try to "'draw meaning from silence,' which *Doyle* and its progeny strictly forbid") (citation omitted).

**¶47** The policy concerns that require a suspect to unambiguously and unequivocally invoke his right to end questioning or speak with counsel are not implicated by the exercise of selective silence. *See Berghuis*, 560 U.S. at 382 ("If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong.") (internal quotation omitted). Protecting the exercise of silence does not change the nature of custodial interrogations because nothing in *Doyle* suggests that if a suspect is selectively silent, the interviewer must decide whether to proceed or risk having the interrogation suppressed. Rather, upholding a suspect's right to due process under *Doyle* rests with defense counsel, prosecutors, and judges, because *Miranda* implicitly promises that a defendant's silence will not be used against him *at trial*. *See Doyle*, 426 U.S. at 619 (explaining that "it does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence") (citation omitted).

**¶48** Here, when the detective asked about more specific details on the shooting, Melendez exercised his right to silence at several points, responding to certain questions by stating he wanted to "pass" some questions and "hold" certain information. In response, the detective affirmatively acknowledged that it was his right not to answer a specific question. The detective also affirmed Melendez's decision to exercise his right to silence by stating she would not force him to talk and setting those topics "aside" by switching to a different line of questioning. Nothing in the record shows the detective was deterred by Melendez's exercise of

partial silence, could not understand Melendez's intent, or felt as if she had to make a decision on how to proceed with the interrogation. Nor does the record suggest the detective did anything improper by continuing to ask questions given that Melendez never unequivocally and unambiguously "invoked" by asking to end questioning or speak with counsel.

### C.      The State's Other Arguments

**¶49**      Citing a few cases, the State contends that Arizona courts have already rejected constitutional protection for selective silence. *See, e.g.*, *State v. Ramirez*, 178 Ariz. 116 (1994); *State v. Corrales*, 161 Ariz. 171 (App. 1989); *State v. Reinhold*, 123 Ariz. 50 (1979). But we do not read these cases, or other decisions discovered through our own research, *see, e.g.*, *State v. Maturana*, 180 Ariz. 126, 130 (1994), as affecting our analysis. None of these cases involve circumstances remotely similar to this case; nor do they distinguish or disagree with the concepts outlined in *Doyle*, as well as *Shing*, *Anderson*, *Ward*, and related Arizona appellate opinions.

**¶50**      The State's comparison to *Garcia-Morales* is also unavailing. There, the defendant refused to answer certain questions, stating "he was not 'feeling cool with that camera.'" *Garcia-Morales*, 942 F.3d at 476. The interviewer then said, "alright well, well later on I'll turn off the camera and you can tell me[,]" and the defendant nodded in agreement. *Id.* The Ninth Circuit held that the defendant was not relying on his right to remain selectively silent but was merely expressing his discomfort with speaking in front of the camera. *Id.* at 476–77. Unlike *Garcia-Morales*, Melendez communicated no conditions on his willingness to respond to specific questions during his interview. And even though Melendez later admitted his unwillingness to answer some questions was motivated in part by wanting to hear what the police already knew about the shooting incident, the reason a suspect may decline to respond to certain questions does not alter his inherent right to due process. *See Doyle*, 426 U.S. at 617–19; *State v. O'Dell*, 108 Ariz. 53, 56 (1972) (explaining that when a suspect "responds to several questions, then lapses into silence when asked an embarrassing question . . . [i]t is much more likely that he is simply asserting his right to remain silent"); *People v. Williams*, 31 N.E.3d. 103, 107–08 (N.Y. 2015) ("A defendant who agrees to speak to the police but refuses to answer certain questions may have the same legitimate or innocent reasons for refusing to answer as a defendant who refuses to speak to the police at all.").

**¶51**      Finally, the State suggests that recognizing a suspect's right to exercise selective silence would conflict with cases that have recognized permissible areas of impeachment. *See, e.g.*, *State v. Henry*, 176 Ariz. 569,

580 (1993). But extending *Doyle* to selective silence does not undermine the well-established principle that a defendant may be impeached with his prior inconsistent statements. *See Anderson*, 447 U.S. at 408 ("*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements.").

**¶52** We hold that the basic principles underlying *Doyle*—due process and fundamental fairness—apply regardless of whether a defendant is completely or partially silent during custodial interrogation. Melendez exercised his right to decline to answer various questions during the interview, and the detective confirmed it was Melendez's right to exercise his rights in that way. It would be inconsistent with the legal authorities discussed above to conclude the State could penalize Melendez at trial for exercising his right not to answer questions, especially when he had not been warned that his silence could be used against him.

## III. Fundamental, Prejudicial Error

**¶53** The State used Melendez's partial silence against him during cross-examination and in closing arguments, which violated his right to due process. *See Doyle*, 426 U.S. at 618. The prosecutor's improper focus penalized Melendez for exercising his right not to answer some of the detective's questions and created fundamental error. *See Escalante*, 245 Ariz. at 141, ¶ 19 (explaining fundamental error goes to the foundation of defendant's case or deprives him of a right essential to his defense); *Sorrell*, 132 Ariz. at 329 (finding that comment on defendant's post-arrest silence "was clearly fundamental error, and it has been held so on numerous occasions"); *Carrillo*, 156 Ariz. at 128 ("Normally, any reference by judge or prosecutor to a defendant's protected silence will constitute fundamental error.").

**¶54** To establish reversible error, Melendez must also establish he was prejudiced by the State's improper use of his partial silence. *See Escalante*, 245 Ariz. at 142, ¶ 21. He must show that without the error, a reasonable probability exists he "*could have*" received a different verdict. *Id.* at 144, ¶ 29. The standard is objective and "requires a showing that without the error, a reasonable jury could have plausibly and intelligently returned a different verdict." *Id.* at ¶ 31. A reasonable jury is "composed of persons of average intelligence and judgment" who use "common sense in considering the evidence presented in connection with the instructions given by the court." *Id.* (citation omitted). Because the jury that decided the case "and a hypothetical 'reasonable jury' share the same presumptive

traits,[] any questions posed by jurors during trial or deliberation may be pertinent in applying the standard objectively." *Id.* at ¶ 32.

¶55            This standard is not "easily satisfied." *Id.* at ¶ 31. In applying this standard, we "examine the entire record, including the parties' theories and arguments as well as the trial evidence." *Id.* "Establishing prejudice from fundamental error varies depending on the nature of the error and the unique case facts." *Id.* at ¶ 29.

¶56            Melendez argues he was prejudiced by the State's misuse of his partial silence because the State's violation of his right to due process "went to the heart" of his defense by undermining his credibility. He argues his credibility was "key" to establishing his assertion of self-defense, and his response to the situation he perceived to be a threat was reasonable. The State counters that references to Melendez's "hesitancy to answer questions," were only made on cross-examination and that the references were "brief" and "tangential." The State also argues that Melendez cannot show the requisite prejudice because his self-defense theory was implausible. We disagree.

¶57            First, the State ignores the impact of the prosecutor's comments during its closing argument on credibility issues. For example, the prosecutor asked jurors to consider various aspects of Melendez's interview with the detective, including: (1) why, in ten or eleven instances, Melendez failed to respond to direct questions about why "did [he] go over there and shoot," and instead said he wanted to hold the information or pass on the question; (2) why, if he believed someone was going to shoot him, did he not tell the police when they arrived; (3) why did he not tell the police, when he was in handcuffs, "here's what happened"; (4) whether he was still trying to figure out what his excuse was going to be; and (5) why he was "withholding information" about whether anything happened to make him mad.

¶58            A reasonable jury would understand these comments to mean that because Melendez failed to timely explain his version of events, it is more likely he was hiding the truth. *See State v. Downing*, 171 Ariz. 431, 433 (App. 1992) ("The potential implication flowing from a defendant's claim of silence is that he has something to conceal, and has not been open and forthright concerning his conduct."); *State v. Scott*, 27 Ariz. App. 361, 363 (1976) (explaining that silence at the time of arrest is "generally not very probative of a defendant's credibility, . . . has a significant potential for prejudice, . . . [and] the jury is likely to assign much more weight to the

defendant's previous silence than is warranted") (quoting *United States v. Hale*, 422 U.S. 171, 180 (1975)).

**¶59** Also, the prosecutor's repeated references to Melendez's failure to timely and adequately answer the detective's questions were not inadvertent. *See State v. Keeley*, 178 Ariz. 233, 235–36 (App. 1994) (reversing conviction where comments about defendant's post-*Miranda* silence arose from prosecutor's "deliberate trial strategy" rather than "inadvertent slip" by testifying officer). Through those references, the prosecutor challenged Melendez's credibility by contrasting his responses, or "hesitancy," with what a "reasonable person" would have told the police. The prosecutor intensified her argument by playing specific portions of the taped interview for the jury. *Cf. State v. Earley*, No. 2 CA-CR 2019-0069, 2020 WL 1870111, at \*1, \*7, ¶¶ 1, 28 (Ariz. App. Apr. 14, 2020) (mem. decision) (finding reversible error based in part on the prosecutor's repeated improper suggestions that the defendant was guilty because he failed to profess his innocence to police).

**¶60** Second, although the State's references to Melendez's silence were brief in the context of the entire trial, Melendez's self-defense theory was largely dependent on his credibility. Thus, the jury had to decide whether it believed Melendez's version of events or A.G.'s (or if there was reasonable doubt as to both versions), and whether the State met its burden of proving the absence of justification for Melendez's conduct. By repeatedly pointing out on cross-examination that Melendez declined to answer many questions bearing directly on the issue of self-defense, Melendez's credibility was undermined by the prosecutor's impermissible references. *See Escalante*, 245 Ariz. at 146, ¶ 41 ("It is appropriate to consider how inadmissible evidence impacted a defense theory when considering prejudice."); *Carrillo*, 156 Ariz. at 128 ("[T]he prosecutor may not raise an inference of defendant's guilty mind by remarking upon the silence of a suspect who exercised his *Miranda* rights."). Those references, which were neither *brief* nor *tangential* in the context of whether Melendez acted in self-defense, caught the attention of at least one juror. Following Melendez's testimony, the court asked him the following juror question: "Why would you tell the detective: 'I still want to hold onto some things'?" Melendez then replied, "I was just keeping silent."

**¶61** Third, the State fails to account for various portions of the trial record bearing on the question of prejudice. *See Escalante*, 245 Ariz. at 144, ¶ 31. Melendez testified he was acting in self-defense when he fired shots at A.G., and the superior court determined the evidence was sufficient to warrant jury instructions on (1) self-defense ("reasonable person in the

situation would have reasonably believed that immediate deadly physical danger appeared to be present") and (2) use of force in crime prevention ("the defendant reasonably believed he/she was preventing the commission of the crime[s])." Those instructions informed the jury the State had the burden to prove beyond a reasonable doubt that Melendez did not act with justification. During deliberations, the jurors sent a note stating they had reached a decision on five of the counts, but not on the sixth. In discussion with counsel, the court noted the case was not complicated and that in "reading the tea leaves," the jury was likely hung on the aggravated assault charge, so it provided the jury with an impasse instruction.

¶62 After further deliberation, the jurors sent a note stating that "[s]ome of us are hung up on the conflict" between the self-defense instruction (what a *reasonable person* in the situation would have believed) versus (what the *defendant* reasonably believed). The court discussed the note with counsel, and then instructed the jury that reasonableness as to self-defense "is different from" reasonableness for crime prevention. The jury then returned guilty verdicts on each of the six counts.

¶63 Although Melendez's self-defense claim had weaknesses, the State does not contend the evidence against him was overwhelming. *See Anderson*, 110 Ariz. at 241 (finding fundamental error but affirming the judgment because the evidence was so overwhelming that the error did not contribute significantly to the verdict). And the exchanges between the jury and the court outlined above reasonably establish that the jury likely struggled with resolution of the aggravated assault count, the most serious charge. Because resolving the justification issues depended heavily on witness credibility, and the State bore the burden of proving Melendez was not justified in firing the shots at A.G., we reject the State's suggestion that Melendez's defense was so implausible that he cannot possibly prove prejudice. *See State v. Almaguer*, 232 Ariz. 190, 193, ¶ 6 (App. 2013) (noting a "defendant is entitled to a jury instruction on justification when he presents the 'slightest evidence' tending to prove a 'hostile demonstration'") (citation omitted). Melendez has met his burden of showing a reasonable probability exists that a reasonable jury could have plausibly and intelligently reached a different verdict without the prosecutor's improper references to Melendez's selective silence.

**CONCLUSION**

**¶64** Fundamental error occurred when the State cross-examined Melendez about his refusal to speak on certain topics during the police interview, and the State compounded the error by emphasizing during closing argument that he withheld information during the interview. Because the error was prejudicial, we reverse Melendez's convictions and sentences and remand for a new trial. Accordingly, we do not address Melendez's argument that his refusal to answer some of the detective's questions should have been precluded under Arizona Rule of Evidence 403.

